IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JASON LEINENBACH,                                       No. 3:17-cv-01703-HZ

            Plaintiff,                                  OPINION & ORDER

      v.

WASHINGTON COUNTY, OREGON,

            Defendant.


Daniel Snyder
Carl Post
John David Burgess
LAW OFFICES OF DANIEL SNYDER
1000 SW Broadway Suite 2400
Portland, Or 97205

        Attorneys for Plaintiff

Kimberly A. Stuart
Assistant County Counsel
OFFICE OF WASHINGTON COUNTY COUNSEL
161 NW Adams Avenue, Suite 35, MS #24
Hillsboro, OR 97124

Liani J. Reeves
BULLARD LAW
200 SW Market Street, Suite 1900
Portland, OR 97201

        Attorneys for Defendants

HERNÁNDEZ, District Judge:

Plaintiff Jason Leinenbach brings this employment action against Defendant Washington County, Oregon, alleging disability discrimination and retaliation under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112; disability discrimination under Or. Rev. Stat. ("ORS") § 659A.112; interference, discrimination and retaliation under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, and the Oregon Family Leave Act ("OFLA"), ORS 659A.150; injured worker discrimination and retaliation under ORS 659A.040; and wrongful termination. Defendant moves for partial summary judgment on Plaintiff's First, Second, Third, Fourth, and Fifth Claims for Relief. Plaintiff also moves for summary judgment on his First and Second Claims for disability discrimination under the ADA and the ORA. For the reasons that follow, the Court grants in part and denies in part Defendant's motion and denies Plaintiff's motion.

## BACKGROUND

### I.    Factual Background

Plaintiff began working for Defendant in 1998 at as jail deputy. Stuart Decl. Ex. 1 (Pl. Dep.) at 38:6–8, ECF 51–52. Sometime before 2002, Plaintiff was diagnosed with anxiety. *Id.* at 50:19–53:1; Leinenbach Decl. ¶ 5, ECF 48. In 2002, Plaintiff was placed on special assignment as a mental health liaison for Washington County Sheriff's Office ("WCSO"). Stuart Decl. Ex. 1 (Pl. Dep.) at 60:6–12. One of his tasks as the mental health liaison was to train WCSO staff on mental health disorders. Stuart Decl. Ex. 1 (Pl. Dep.) at 67:2–68:22. When he trained staff on anxiety, he would cite his own experience as an example. *Id.*

Plaintiff returned to duty at the jail in 2014. Leinenbach Decl. ¶ 14. Plaintiff began having problems at work: he avoided work, missed meetings, and failed to respond to emails and

calls from his supervisor. Stuart Decl. Ex. 4 at 5–11. In May of 2014, Commander Bose opened a Service Related Inquiry Memo ("SRIM") into Plaintiff's conduct. Stuart Decl. Ex. 4. The investigation revealed that Plaintiff had missed a full week of work since February. Stuart Decl. Ex. 5 at 2. Plaintiff was suspended for three days without pay. *Id.* at 3.

In transitioning back to the jail, Plaintiff also experienced difficulties with supervision by former junior staff and problems with more senior deputies and staff. Stuart Decl. Ex. 2 at 11–12. When Plaintiff received small criticisms, he felt "almost paranoid" like he was being "looked at under a microscope." Stuart Dec. Ex. 7 at 5. When another staff member investigated issues with Plaintiff's supervisor Sgt. Pete Moesler, Sgt. Moesler revealed that he struggled to supervise Plaintiff. Stuart Decl. Ex. 8 at 20. He said that attempts to communicate with him resulted in Plaintiff being "overly emotional or mad" and almost always ended with "Leinenbach sobbing." *Id.*

In June of 2015, Plaintiff and several others were subject to a SRIM for personal use of the internet while on duty. Stuart Decl. Ex. 9. No formal discipline resulted from this SRIM. Stuart Decl. Ex. 1 (Pl. Dep.) at 174:10–176:2. But Plaintiff received an overall rating of "below standard" on his 2015 annual review, which highlighted the 2014 and 2015 SRIMs. Stuart Decl. Ex. 6. Plaintiff was stressed by his below-standard rating and ultimately sent a list of complaints about his supervisor to Sheriff Garrett. Stuart Decl. Ex. 7.

In 2015, Plaintiff also had significant stressors in his personal life. That summer, Plaintiff moved his dying father-in-law from Nevada to Oregon to live with him and his family. Stuart Decl. Ex. 1 (Pl. Dep.) at 244:24–245:22. Plaintiff contends that he was denied FMLA leave during this time. *Id.* at 244:4–246:3. But on March 21, 2016, Plaintiff's request for intermittent OFLA leave for February 2 through August 2, 2016, was approved. Stuart Decl. Ex. 15.

Between 2014 and 2016, Defendant contends that Plaintiff's colleagues at the WCSO reported concerning behavior. For example, in early 2016, Plaintiff placed his head on the cutting board of a paper cutter. Leinenbach Decl. ¶ 20; Stuart Decl. Ex. 13. Plaintiff alleges that people were joking around about the cutting board, "which never seemed to work properly" and had a dull blade. Leinenbach Decl. ¶ 20. According to Plaintiff, in a "joking manner" he placed his head on the cutting board, said "just kill me," and pretended the handle was coming down. *Id.* Plaintiff agreed to let Sgt. Ashenfelter take a photo. *Id.* Over a month later, Sgt. Ashenfelter sent this photo in an email to Lt. McCrea, claiming that the Plaintiff jokingly made suicidal statements. *Id.* ¶ 23, Ex. 3. Though he didn't take his comment seriously because of his demeanor, Sgt. Ashenfelter also claimed that on a different date Plaintiff stated, "Well, I'm going to go home and kill myself now!" in front of staff and inmates. *Id.* at Ex. 3. Plaintiff denies this statement. *Id.* at ¶ 23.

Plaintiff was also involved in incidents with agitated inmates. On February 15, 2016, WCSO received a report that Plaintiff used profane and derogatory language and challenged an inmate to a fight. Stuart Decl. Ex. 10. Video footage of the incident showed that Plaintiff engaged in a heated exchanged with the inmate before opening the cell door. *Id.* at 3–4. Though there was no audio to corroborate the report that Plaintiff had used abusive language or challenged the inmate to a fight, the SRIM investigation of the incident conducted by Sgt. Tony Shaddy concluded that he had engaged in an unsafe practice by opening the door of an agitated inmate. Stuart Decl. Ex. 10 at 10. Although jail deputies are not forbidden from opening the doors of all inmates, they must exercise good judgment with regard for safety and security when doing so. *Id.* at 7. Plaintiff contends that he was making frequent welfare checks on the inmate and was making every effort to keep him calm and safe. Leinenbach Decl. ¶ 18. In his

deposition, Plaintiff said that he "simply cracked open the door" to "reduce a . . . barrier that [he] felt was rude at the time when [the inmate] was opening up to" Plaintiff. Stuart Decl. Ex. 1 (Pl. Dep.) at 205:14–21.

Around April 27, 2016, Plaintiff had a heated interaction with an inmate who was being placed on suicide watch. Stuart Dec. Ex. 12. They exchanged words, and the inmate flipped Plaintiff off and told him "fuck you" or to "fuck off." Stuart Decl. Ex. 12; Stuart Decl. Ex. 1 (Pl. Dep.) at 210:22–23. When Sgt. Iverson tried to speak with Plaintiff about the incident, Plaintiff began to cry. Stuart Decl. Ex. 12. He expressed frustration at having been yelled at by different inmates for no reason. *Id.*

After talking with Sgts. Iverson and Ashenfelter later that day, Lt. McCrea sent an email to shift sergeants asking for feedback regarding Plaintiff. Stuart Decl. Exs. 11, 12. He had received concerns about Plaintiff's abnormal behavior and strange comments. *Id.* at 11. On May 5, 2016, after receiving a handful emails from shift sergeants and talking to Sgts. Iverson and Ashenfelter, Lt. McCrea requested that Plaintiff be sent for a fitness for duty examination. *Id.* at Ex. 12; Burgess Decl. Ex. 2 (Dale Dep.) at 16:1–17:6, ECF 49.

On May 9, 2016, Plaintiff called Sgt. Iverson after having been up all night caring for his dying father-in-law and requested one day of FMLA leave. Leinenbach Decl. ¶ 24. But in a letter dated May 9, 2016, WCSO told Plaintiff he was being placed on non-disciplinary paid administrative leave and sent for an independent medical evaluation with Dr. David Corey. Stuart Decl. Ex. 16; Leinenbach Decl. ¶ 25; Burgess Decl. Ex. 2 (Dale Dep.) at 12:12–18. Matt Dale—a senior analyst from Human Resources—asked Dr. Corey to determine, among other things, whether Plaintiff was "safe to perform his duties without risk of harm to self or others." Burgess Decl. Ex. 2 (Dale Dep.) at 32:13–19, 33:5–15.

On June 16, 2016, Dr. Corey evaluated Plaintiff. He determined that he did not suffer from any condition that prevented him from performing the essential functions of his position. Stuart Decl. Ex. 43 at 3; *see also* Burgess Decl. Ex. 3 (Corey Dep.) at 28:5–29:6, 65:20–66:7. He also determined, however, that "to the extent that his overly emotional, dramatic and reactive behavior is deemed by the employer to threaten institutional security or safety, it may well justify regarding him as unfit for duty." *Id.* According to Plaintiff, Dr. Corey told him that if he became tearful at work, Defendant was going to fire him. Leinenbach Decl. ¶ 26. Dr. Corey denies having told Plaintiff he would be terminated but admits to having discussed that crying at work would likely cause additional concerns about his psychological fitness. Corey Decl. ¶ 3, ECF 69.

Because of Dr. Corey's evaluation releasing Plaintiff to full duty, Defendant returned Plaintiff to work with a letter of expectations outlining his return to duty. Stuart Decl. Ex. 18. In response, Plaintiff sent a letter dated August 2, 2016, informing Lt. Sundsted that he believed he was being scrutinized unfairly because of his disabilities and protected leave. Stuart Decl. Ex. 19. Lt. Sunstead informed Plaintiff by email that he had forwarded his letter to the Human Resources Department. Stuart Decl. Ex. 20.

Plaintiff received his annual evaluation on August 24, 2016, from his new supervisor Sgt. Shaddy. Stuart Decl. Ex. 14. Because of his 2016 SRIM, Plaintiff was marked as "below standard" in policy and safety. *Id*. Plaintiff indicated on his evaluation form that he did not agree with the evaluation, was subjected to or witnessed harassment, and was not paid all wages due. *Id*. On September 1, 2016, Mr. Dale reached out to Plaintiff to set up a review of the 2016 evaluation and his complaint of harassment. Stuart Decl. Ex. 21. Plaintiff said that he reported to Mr. Dale that he was experiencing a hostile work environment because of his disability. Leinenbach Decl. ¶ 34. During their meeting on September 7, Mr. Dale reported that Plaintiff

yelled, cried, and used profane language. Stuart Decl. Ex. 22 at 5–6. Later, Plaintiff came to believe that a former employee was listening in on his conversation with Mr. Dale and that their conversation had been recorded. Stuart Decl. Ex. 30; Stuart Decl. Ex. 1 (Pl. Dep.) at 275:21–277:16; Stuart Decl. Ex. 41 (Zimkas Dep.) at 25:3–26:4.

Using sick time and vacation leave, Plaintiff was out of the office from September 12 to 21, 2016. Leinenbach Decl. ¶¶ 35–36. During this time, the benefits supervisor sent Plaintiff FMLA paperwork, and Plaintiff met with his primary care physician, Dr. Jeffrey Stossel, to fill it out on September 20, 2016. *Id.* at ¶ 36. Dr. Stossel cleared Plaintiff to return to work on September 21, 2016. *Id.*

On September 12, 2016, Plaintiff also filed a worker's compensation claim. Stuart Decl. Ex. 23. He reported increased anxiety and an inability to return to work since his interview with Mr. Dale. *Id.* On September 21, he had a phone interview regarding his claim. Stuart Decl. Ex. 2. He said that he did not feel ready to go back to work that night. *Id.* at 37. That same day, his claim was denied. Stuart Decl. Ex. 50.

Plaintiff returned to the night shift on September 21, 2016, but walked out of the nightly required briefing at the beginning of his shift. Stuart Decl. Ex. 28; Stuart Decl. Ex 40 (Massey Dep.) at 35:19–22. He allegedly reported that he could not handle being at the meeting and was emotional before walking directly to his post. Stuart Decl. Ex. 28. Sgt. Massey went to check on Plaintiff. *Id.* Plaintiff testified that told her he did not want to talk about it and get upset at work. Stuart Decl. Ex. 1 (Pl. Dep.) at 264:4–18. But when she asked how he was doing, he "immediately became tearful" and told her about his disputed evaluation and recent meeting with Human Resources. Stuart Decl. Ex. 28. Plaintiff says that he had expressed his concerns to Sgt. Massey about showing his emotions because Dr. Corey told him he would be fired if he was

tearful at work. Leinenbach Decl. ¶ 37. Sgt. Massey allegedly assured him that he would not get fired for crying and related to him that she had a difficult time making it through briefing without crying after her father had passed away. *Id.* Though she admitted to having shared with Plaintiff her own experience with health issues in her family, Sgt. Massey denied having admitted to crying at work or having heard that Dr. Corey warned him not to be emotional. Reeves Decl. Ex. 5 (Massey Dep.) at 11:15–13:2, 31:2–32:3, ECF 55.

 Based on these statements and emotional state, Sgt. Massey decided to send Plaintiff home. Stuart Decl. Ex. 28. She was concerned that he might not be safe or effective at supervising inmates. *Id.*; Reeves Decl. Ex. 5 (Massey Dep.) at 37:15–23. After stating that he intended to file a harassment complaint against Mr. Dale, Plaintiff referred to Sgt. Massey as the "enemy, but not in a bad way." Stuart Decl. Ex. 28; Stuart Decl. Ex. 40 (Massey Dep.) at 51:14–52:6; Stuart Decl. Ex. 41 (Zimkas Dep.) at 10:10–18. In an email, Sgt. Massey stated that this "made the hair on the back of [her] neck stand up and caused [her] concern about how [Plaintiff] might react if his paranoia regarding [her] intentions continued." Stuart Decl. Ex. 29. These statements made her nervous about his intentions and irrational perspective, and she began traveling to and from work in uniform. *Id.* On September 22, 2016, Plaintiff requested intermittent FMLA leave from September 20, 2016, to March 20, 2017. Stuart Decl. Ex. 24.

On September 26, 2016, Plaintiff returned to work. Leinenbach Decl. ¶ 40. He was told that he was being placed on administrative leave by Lts. Sundsted and McCrea, who were waiting for him outside the locker room. *Id.* Allegedly, they told him he was being sent to Dr. Corey for a second IME because he had become tearful in his conversation with Sgt Massey. *Id.* In a letter dated September 27, 2016, Sherriff Garret informed Plaintiff that he had been placed on paid administrative leave to attend another IME with Dr. Corey. Stuart Decl. Ex 26. The letter

noted that Plaintiff had exhibited concerning emotions while on assignment to work in the maximum-security pod, presumably referring to Plaintiff's discussion with Sgt. Massey a week prior. *Id.*

On October 4, 2016, Plaintiff went to his second IME with Dr. Corey. Leinenbach Decl. ¶ 42. Allegedly, Dr. Corey told Plaintiff at the outset that he "made a terrible mistake releasing [him] to work in June" and that Defendant "did not want [him] back." Leinenbach Decl. ¶ 42. Dr. Corey is alleged to have said that he was going to agree with Defendant and find him not fit for duty. *Id.* Dr. Corey re-administered the "MMPI" test,[1] during which Plaintiff was very upset, frustrated, and scared. *Id.*

Dr. Corey issued his second report on October 7, 2016, finding Plaintiff was suffering from a mental health condition that prevented him from performing the essential functions of his position. Stuart Decl. Ex. 44. Specifically, he found

> [Plaintiff] cannot reliably and effectively make judgments and decisions; maintain socially appropriate work behavior; work under emergency and stressful conditions; and communicate effectively. Although [Plaintiff] asserts that he can deal effectively with inmates so long as he does not have to interact with supervisors, this, of course, is an unrealistic condition. Consequently, in light of his hypersensitivity to supervisorial correction and criticism, and his inability to properly modulate his emotions and behavior under such conditions, his impairment also limits his ability to perform these other essential functions: working alone or apart in physical isolation from others; influencing people in their opinions, attitudes, and judgments; directing, controlling, or planning activities of others; supervising inmates' movements; counseling inmates regarding their behavior in jail; maintaining discipline; gaining the cooperation of inmates; handling difficult prisoners with patience and firmness; using physical force when necessary; dealing tactfully with the public; and withstanding verbal abuse.

*Id.* at 4. He noted that Plaintiff was "unable to be supervised" and would "require ongoing treatment for his anxiety disorder." *Id.* Though Dr. Corey found that he posed a "low risk of

---

[1] The MMPI is the Minnesota Multiphasic Personality Inventory-2-Restructrued Form. Def. Resp. Pl. Mot. Summ J. 3, ECF 54.

imminent violence against co-workers and supervisors outside of his role as Jail Deputy," he also indicated that his impaired functioning could have catastrophic consequences for the welfare of others in a "safety-sensitive position such as that of Jail Deputy." *Id.*

On October 14, 2016, WCSO sent Plaintiff a letter informing him that he was being subjected to a medical layoff. Stuart Decl. Ex. 27. The letter notified Plaintiff that he would not be returned to work without a release from a qualified and licensed psychologist. *Id.* Deputy Zimkas and Lts. McCrea and Sundsted drove to a Starbucks near Plaintiff's home to meet Plaintiff and deliver the notice. Leinenbach Decl. ¶ 44. Plaintiff alleges that Lt. McCrea engaged in threatening behavior towards him, including yelling at him and placing his hand on his firearm. *Id.*; Stuart Decl. Ex. 2 (Pl. Dep.) at 289:10–14. Lts. McCrea and Sundsted and Deputy Zimkas all deny such allegations. Stuart Decl. Ex. 39 (McCrea Dep.) at 62:2–8; Stuart Decl. Ex. 41 (Zimkas Dep.) at 41:13-43:19; Reeves Decl. Ex. 10 (McCrea Dep.) at 57:3–20, 61:7–62:1.

On November 4, 2016, Plaintiff underwent an examination with psychiatrist Ronald Turco M.D. Stuart Decl. Ex. 49. Dr. Turco also administered an MMPI test and ultimately concluded that "[t]here is no psychiatric/medical reason not to return [Plaintiff] to work." *Id.* He determined that Plaintiff's issues were "personality issues inherent in his developmental and adult life" and that he was not a danger to himself or others. *Id.* The letter was given to County counsel and Human Resources in mid-November. Leinenbach Decl. ¶ 45; Stuart Decl. Ex. 38. At Defendant's request, Dr. Corey reviewed the report of Dr. Turco. Stuart Decl. Exs. 45, 46. He took issue with some of his findings and analysis on key issues, and he indicated that he still believed that Plaintiff was unfit for duty. *Id.* at Ex. 46

Because of the conflicting reports from Dr. Turco and Dr. Corey, Defendant placed Plaintiff back on paid administrative leave and suspended his medical layoff on November 17,

2016. Stuart Decl. Ex. 38. Human Resources Manager Steve Sanford and Commander Frohnert met with Plaintiff on January 17, 2017 to discuss reasonable accommodations to perform his job. Leinenbach Decl. ¶ 46; Stuart Decl. Ex. 33. The requested accommodations included: (1) advance notice of meetings with supervisors that involved criticism; (2) recording of supervisory, counseling or disciplinary meetings; (3) non-threatening discussions of performance issues at least sixty days in advance of performance evaluations; and (4) the ability to take breaks when Plaintiff started to feel anxious. Stuart Decl. Ex. 33. Though Plaintiff and Defendant differ slightly in their recollection of the details of this meeting, *see id.* (email exchange recapping meeting and noting inaccuracies and clarifications); Reeves Decl. Ex. 8 (Frohnert Dep.) at 40:20–23, 43:15–44:2, both agree that they discussed Plaintiff's request for reasonable accommodation and the conflicting reports from Dr. Corey and Dr. Turco, *id.*

On January 31, 2017, Plaintiff gave his shift and vacation bid to Corporal Kearns. Leinenbach Decl. Ex. ¶ 50. His vacation bid was not put on the calendar. *Id.* He also sent an email to Lt. Sundsted stating that his first-choice duty was court security, but the position was given to a less senior deputy. *Id.* According to Commander Frohnert, union representatives and county supervisors had attempted to contact Plaintiff but received no response when shifts were due in mid-January. Frohnert Decl. ¶ 3, ECF 57. By January 31, 2017, bidding had closed, and Plaintiff had not returned to work. *Id.* at ¶¶ 3–4.

On February 2, 2017, Defendant discussed Plaintiff's requested accommodations by phone. Stuart Decl. Ex. 34. A week later, Defendant confirmed in a letter that it would adopt some of those accommodations if Plaintiff was released to return to duty. *Id.* Specifically, Defendant agreed to: (1) make reasonable efforts to provide Plaintiff with advance notice of meetings with supervisors that involved feedback; (2) allow Plaintiff to record investigatory,

counseling, and disciplinary interviews after notifying participants; (3) make reasonable efforts to inform Plaintiff of performance deficiencies in advance of evaluations; and (4) make reasonable efforts to provide Plaintiff with a break when he started to feel anxious if circumstances allowed. *Id.* In the letter, Defendant also informed Plaintiff that they would be seeking the opinion of a third mental health expert, Dr. Eugene Klecan. *Id.*; Stuart Decl. Ex. 47.

On May 22, 2017, Dr. Klecan preformed an evaluation and reviewed the reports of Drs. Corey and Turco. Stuart Decl. Ex. 48. Dr. Klecan was provided with a job description from Defendant. Leinenbach Decl. Ex. ¶ 55, Ex. 19. According to the job description, a jail deputy's essential duties included: conducting security and inmate welfare checks, supervising and counseling inmates, maintaining discipline, responding to jail emergencies, conducting security checks, and monitoring inmates in a variety of custody settings. *Id.* Other skills and abilities included communicating effectively and establishing and maintaining cooperative working relationships with others. *Id.*

Ultimately, Dr. Klecan determined that Plaintiff had a mental health condition that prevented him from performing the essential functions of the position of a jail deputy with or without accommodation. Stuart Decl. Ex. 48 at 29–30. But in his report he stated that he was not aware of "any areas of concern regarding his mental or emotional state that could impact [Plaintiff's] effectiveness in maintaining jail security and inmate safety." *Id.* at 28. Instead, Dr. Klecan found that: (1) "[Plaintiff] becomes unpredictably and temporarily unable to function normally at the job, meaning unable to communicate and conduct himself appropriately in the presence of supervisors, co-workers, inmates, or anyone" and (2) "he is for all practical purposes incapable of being supervised." *Id.* at 29–30. Plaintiff alleges that—except for the days he was

on medical leave—he has been able to perform all of his job duties listed in the job description that was provided to Dr. Klecan. Leinenbach Decl. ¶ 55.

Based on this report, Defendant once again subjected Plaintiff to a medical layoff as of June 21, 2017. Stuart Dec. Ex. 25. Defendant indicated that he was not fit for duty. *Id.*

On August 10, 2018, Defendant was provided with a release from Plaintiff's primary care physician, Dr. Stossel. Leinenbach Decl. Ex. 21. Dr. Stossel indicated that Plaintiff was able to perform the essential functions of his position as a WCSO deputy without accommodation and released him to return to work. *Id.*

## II.      Procedural History

On October 14, 2016, Defendant received a Tort Claim Notice from Plaintiff dated October 10, 2016, alleging disability discrimination under state and federal law, workers' compensation discrimination, and violations of OFLA and FMLA. Stuart Decl. Ex. 30. Defendant received a supplemental notice on October 18, 2016, dated October 14, 2016. Stuart Decl. Ex. 31.

On February 20, 2017, Plaintiff filed a complaint with the Oregon Bureau of Labor and Industries ("BOLI"). Stuart Decl. Ex. 37. On July 31, 2017, BOLI issued a right to sue letter upon closing Plaintiff's case for failure to cooperate. Stuart Decl. Ex. 38 at 3. On October 11, 2017, Defendants received another Supplemental Tort Notice dated October 5, 2017, from Plaintiff's counsel. Stuart Decl. Ex. 32. On October 26, 2017, Plaintiff filed this case. Compl., ECF 1.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The

moving party bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014) (internal quotation marks omitted); *see also Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985) ("Even where the

basic facts are stipulated, if the parties dispute what inferences should be drawn from them, summary judgment is improper.").

## DISCUSSION

### I.      Defendant's Motion for Summary Judgment

Defendant moves for summary judgment on all of Plaintiff's claims except for his Sixth Claim for Wrongful Termination. First, Defendant argues that Plaintiff cannot bring claims based on acts barred by the OTCA and the statute of limitations applicable to his disability discrimination and FMLA claims. Second, Defendant argues it is entitled to summary judgment on Plaintiff's hostile work environment claims under the ADA. Third, Defendant argues that Plaintiff's FMLA and OFLA interference and retaliation claims fail for lack of causation. Fourth, Defendant argues that Plaintiff's claim for injured worker discrimination similarly lacks a causal nexus.

The Court agrees with Defendant that Plaintiff is barred from bringing claims for actions outside the limitations period. In addition, the Court finds Plaintiff has failed to provide any evidence to support his claims for FMLA or OFLA retaliation and has abandoned his ADA hostile work environment theory of liability. However, the Court declines to grant summary judgment on Plaintiff's FMLA and OFLA interference claims and injured worker discrimination claims because there is a dispute of fact on the element of causation.

### A.      Oregon Tort Claims Act.

Defendant argues that Plaintiff is barred from bringing claims under state law for any actions that occurred prior to October 13, 2016, 180 days before Plaintiff's first notice of tort claims. Def. Mot. Partial Summ. J. ("Def. Mot.") 20–21, ECF 50 (citing ORS 30.275). Plaintiff agrees that he cannot recover damages for conduct that allegedly violates state law prior to April

13, 2016. But, citing federal law, Plaintiff argues that he can use these acts as "background evidence in support of a timely claim." Pl. Resp. Def. Mot. Summ. J ("Pl. Resp.") 8, ECF 53 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

Though neither party has adequately addressed this issue, the Court finds that Plaintiff is likely correct that the rules described in *National Railroad Passenger Corp. v. Morgan* apply to his claims subject to the OTCA. Generally, Oregon's "continuing tort doctrine" applies to state employment law claims subject to the OTCA. *See Griffin By & Through Stanley v. Tri-Cty. Metro. Transp. Dist. of Oregon,* 112 Or. App. 575, 581, 831 P.2d 42, 46 (1992), amended (June 2, 1992), *aff'd in part, rev'd in part,* 318 Or. 500, 870 P.2d 808 (1994) (applying the continuing tort doctrine to an employment discrimination claim subject to the OTCA). And *Morgan*—which analyzes the federal continuing violation doctrine—may be instructive in this case as "the continuing violation doctrine under federal law appears perfectly congruous with the lines drawn between continuous torts and separate discrete acts under Oregon law." *Atwood v. Or. Dept. of Transp.*, No. CV-06-1726-ST, 2008 WL 803020, at *13 (D. Or. Mar. 20, 2008) (applying *Morgan* to state disability discrimination and hostile work environment claims). Consequently, as both parties acknowledge, acts prior to April 13, 2016, are not actionable under state law to the extent that they are not part of the same unlawful employment practice. They likely can be used, however, as background evidence to support Plaintiff's timely claims. *See Morgan*, 536 U.S. at 113 (noting that Title VII does not "bar an employee from using the prior acts as background evidence in support of a timely claim").

### B.    ADA Statute of Limitations

Both parties agree that—at least for the purposes of these dispositive motions—Plaintiff is barred from bringing claims for allegedly discriminatory acts that occurred prior to April 26,

2016, which is 300 days prior to Plaintiff's BOLI charge. *See* Pl. Resp. 9; Def. Reply Partial

Mot. Summ. J. ("Def. Reply") 9, ECF 67.

### C.    ADA Hostile Work Environment Claims

Defendant also argues that Plaintiff's "hostile work environment claims" fail as a matter

of law. Def. Mot. 23–35. In his complaint, Plaintiff asserts that Defendant discriminated against

him by subjecting him to a hostile work environment. Compl. ¶¶ 47, 60; *see also* Pl. Resp. 8

("Leinenbach asserts claims under the ADA . . . [and] ORS 659A.103 for . . . hostile work

environment."). However, in response to Defendant's motion, Plaintiff asserts that he "is not

pursing a hostile work environment claim as part of his disability claims." Pl. Resp. 9.

Accordingly, the Court finds that Plaintiff has abandoned this theory of recovery.

### D.    FMLA and OFLA Claims

Defendant argues that Plaintiff cannot meet his *prima facie* burden on his interference,

discrimination, and retaliation claims arising under FMLA and OFLA. The OFLA is to be

"construed to the extent possible in a manner that is consistent with any similar provisions of [the

FMLA]." ORS 659A.186(2). The FMLA "creates two interrelated substantive rights for

employees." *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1132 (9th Cir. 2003). "First, an employee

has the right to take up to twelve weeks of leave" for the reasons described in the statute. *Id.*

Second, an employee who takes such leave "has the right to be restored to his or her original

position or to a position equivalent in benefits, pay, and conditions of employment upon return

from leave." *Id.* (internal citations omitted).

It is unlawful for an employer to "interfere with, restrain, or deny the exercise or the

attempt to exercise, any right provided" by the FMLA. *Bachelder v. Am. W. Airlines, Inc.*, 259

F.3d 1112, 1122 (9th Cir. 2001) (citing 29 U.S.C. § 2615(a)(1)). The Ninth Circuit has

recognized two theories of recovery under 29 U.S.C. § 2615: "the retaliation or discrimination theory and the entitlement or interference theory." *Sanders v. City of Newport*, 657 F.3d 772, 777 (9th Cir. 2011) (quoting *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002)). "While the FMLA does not clearly delineate these two claims with the labels 'interference' and 'retaliation,' those are the labels courts have used in describing an employee's claims under the Act." *Id.* (quoting *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 n.9 (11th Cir. 2001)).

Defendant makes three arguments in support of its motion for summary judgment on Plaintiff's FMLA and OFLA claims. First, it argues that Plaintiff is barred from bringing a claim for Defendant's denial of leave in the summer of 2015 under FMLA. Second, Defendant argues that Plaintiff cannot show that the use of protected leave was a negative factor in any adverse employment action. Third, Defendant contends that Plaintiff cannot make out a discrimination or retaliation claim because Plaintiff has offered no evidence that he opposed any practice made unlawful by FMLA or OFLA.

      i.      Statute of Limitations

Generally, the statute of limitations for claims arising under the FMLA is two years "after the date of the last event constituting the alleged violation." 29 U.S.C. § 2617(c)(1). The statute of limitations extends to three years, however, for violations that are "willful." *Id.* at § 2617(c)(2). "[N]either the Supreme Court nor the Ninth Circuit Court of Appeals has defined willfulness under the FMLA," but "other circuits have looked to the Supreme Court's definition of 'willful' in the context of the Fair Labor Standards Act." *Shulman v. Amazon.com, Inc.*, No C13-247RSM, 2013 WL 2403256, at *2 (W.D. Wash., May 30, 2013). "Under the FLSA, an employer acts 'willfully' when he or she 'either knew or showed reckless disregard for the

matter of whether its conduct was prohibited by the statute.'" *Schultz v. Wells Fargo Bank, Nat'l Ass'n*, 970 F.Supp.2d 1039, 1053 (D. Or. 2013) (citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988)); *see also Hollowell v. Kaiser Found. Health Plan of the NW*, 705 Fed.Appx. 501, 503 (9th Cir. 2017) (applying *McLaughlin*'s willfulness standard to an FMLA claim). Thus, under the FMLA the burden is on the plaintiff to "show that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Batson v. T-Mobile U.S.A., Inc.*, Civ. No. 08-6204-AA, 2010 WL 1924676, at *2 (D. Or. May 11, 2010).

Plaintiff suggests in his response brief that the three-year statute of limitations applicable to "willful" conduct should apply to this case because Defendant fails to provide any facts to support its argument that the two-year statute of limitations applies. Pl. Resp. 9. In its Reply, Defendant notes that Plaintiff did not allege "willful" conduct in the Complaint or provide any evidence to support such allegations in either his Complaint or Response. Def. Reply. 12. Accordingly, Defendant argues that the Court should decline to apply the longer statute of limitations. *Id.*

The Court agrees with Defendant. Nowhere in the Complaint does Plaintiff allege that Defendant's actions were "willful." Nor is the relevant 2015 denial of leave mentioned in the Complaint. However, even if Plaintiff had made such allegations, he failed to meet his burden to present facts that support his claim that Defendant's conduct was willful. The record is devoid of any evidence to suggest that Defendant knew or showed reckless disregard for whether its denial of leave was prohibited by the statute.[2] Accordingly, the Court finds that the shorter, two-year

---

[2] Plaintiff asserts in his argument that "[t]he facts addressed below establish that a jury could find the County acted willfully" in denying his leave in 2015. Pl. Resp. 12. But Plaintiff fails to discuss the denial of leave again in his argument on his FMLA and OFLA claims. Without more,

limitations period applies to this case, and Plaintiff is barred from seeking relief under FMLA for alleged violations that occurred prior to October 26, 2015.[3]

### ii. Interference

Section 2615(a)(1) of the FMLA provides that "it shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or attempt to exercise any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). An allegation a plaintiff has been retaliated against for exercising his or her FMLA rights is properly construed as an interference claim under § 2615(a)(1)). *Bachelder*, 259 F.3d at 1124. Under this theory of liability, "a plaintiff must show that (1) she took FMLA-protected leave; and (2) it constituted a 'negative factor' in an adverse employment decision." *Escriba v. Foster Poultry Farms*, 793 F. Supp. 2d 1147, 1165 (E.D. Cal. 2011) (citing *Bachelder*, 259 F.3d at 1125). The *McDonnell Douglas* burden shifting analysis does not apply to FMLA interference claims, so a plaintiff "can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Bachelder*, 259 F.3d at 1125.

Defendant suggests that Plaintiff has failed to show any causal connection between Plaintiff's request and exercise of FMLA leave and any adverse employment actions.[4] In

---

the Court fails to see what facts allegedly establish willfulness with respect to the 2015 denial of leave.

[3] For OFLA, Plaintiff is barred from seeking relief for acts that occurred prior to April 13, 2016, under the OTCA. *See supra* Section I(A).

[4] An adverse employment action is "any action that is reasonably likely to deter an employee from engaging in protected activity." *Shepard v. City of Portland,* 829 F. Supp. 2d 940, 960–61 (D. Or. 2011) (internal citations omitted)*; see also Brooks*, 229 F.3d at 928–29 (The circuit court noted that termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review, and refusal to consider an employee for promotion are adverse employment actions). Defendant does not appear to challenge Plaintiff's characterization of the investigations, administrative leave, medical leave, or negative performance evaluations as "adverse employment actions." Accordingly, the Court does not separately decide this issue and assumes for the purposes of this motion that these actions are adverse.

response, Plaintiff relies heavily on the temporal proximity of his use of and request for medical leave and various adverse employment actions.

To establish causation Plaintiff must show "by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [his] firing and that but for such activity [he] would not have been fired." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064–65 (9th Cir. 2002). As the Ninth Circuit has previously stated, "in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." *Id.* at 1065. In *Villiarimo*, the Court held that the "nearly 18-month lapse between the protected activity an adverse employment action [was] simply too long, by itself, to give rise to an inference of causation." *Id.* at 1065; *see also Foraker v. Apollo Grp. Inc.*, 427 F.Supp.2d 936, 943 (D. Az. 2006) (A six-month lapse is too long, standing alone, to establish a *prima facie* case of retaliation.). By comparison, a lapse of less than two months may be sufficient to let the issue go to a jury. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (sufficient evidence of causation where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after investigation ended); *Foraker*, 427 F.Supp.2d at 943 (citing cases and indicating that a two-month lapse in time is sufficient to withstand summary judgment).

Here, at least a few of the alleged adverse actions occurred on the heels of Plaintiff's use of or request for FMLA leave. Plaintiff requested intermittent FMLA and OFLA leave for February 2 through August 2, 2016, to care for his dying father in law. Stuart Decl. Ex. 15. On February 15, 2016, Defendants started an investigation into an interaction with an inmate, which—though initially resolved in his favor—formed part of the basis for a "below standard" rating in his performance review in August of that year. Stuart Decl. Exs. 10, 14. Similarly, on

the morning of May 9, Plaintiff talked to Sgt. Iverson and requested one day of leave to care for his dying father in law. Leinenbach Decl. ¶ 24. That day, Commander Frohnert wrote a letter informing Plaintiff that he had been placed on administrative leave. Stuart Decl. Ex. 16. On September 22, Plaintiff requested intermittent medical leave to care for his own health condition from September 20 through March 20. Stuart Decl. Ex. 24. Four days later, Plaintiff was placed on administrative leave. Leinenbach Decl. ¶ 40; Stuart Decl. Ex. 26. Less than a month later, he was subjected to a medical layoff. Stuart Decl. Ex. 27. Despite having been released for work by a medical expert in November, Plaintiff was not returned to duty. Instead, he was placed back on administrative leave and ultimately never returned to work. *See* Stuart Decl. Exs. 34, 38, 49. These adverse actions all occurred contemporaneously with or soon after Plaintiff's exercise of his rights under the FMLA and OFLA. Thus, Plaintiff has submitted at least some evidence from which a reasonable factfinder could conclude that Defendant retaliated against him for engaging in protected activity.

### iii.    Retaliation or Discrimination

In Claims Three and Four, Plaintiff alleges that Defendant retaliated and discriminated against him in violation of the FMLA and OFLA. *Bachelder*, 259 F.3d at 1124. Section 2615(b) makes it "unlawful for any person to discharge or in any other manner discriminate against any individual because such individual has" participated in FMLA enforcement proceedings. 29 U.S.C. § 2615(b). Section 2615(a)(2) more broadly makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. *Id.* at § 2615(a)(2). For both claims, the plaintiff has to show "(1) involvement in a protected activity under the FMLA; (2) an adverse employment action; and (3) a causal link between the protected activity and the employment action." *Schultz*, 970 F. Supp.2d

at 1059. An adverse action in the context of retaliation clams is "any action that is 'reasonably likely to deter employees from engaging in protected activity.'" *deBarros v. Wal-Mart Stores*, No. 6:11-cv-06116-AA, 2013 WL 3199670, at *6 (D.Or. June 19, 2013) (quoting *Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir. 2000)). In this circuit, courts apply "the *McDonnell Douglas* burden shifting framework when analyzing FMLA retaliation claims." *Schultz*, 970 F.Supp.2d at 1058; *see also deBarros*, 2013 WL 3199670, at * 4 (applying the *McDonnell Douglas* burden shifting framework to claims brought under both §§ 2615(a)(2) and (b)).

On this issue, Plaintiff has neither responded to Defendant's argument nor cited any evidence to show that he participated in any enforcement proceedings as required by § 2615(b) or opposed any practice made unlawful by the FMLA as required by § 2615(a)(2). In addition, though Plaintiff uses the words "retaliation" and "discrimination" in his Complaint, Claims 3 and 4 are more appropriately characterized as interference claims. *See e.g.* Compl. ¶ 75 ("The County interfered, discriminated and retaliated against Deputy Leinenbach for engaging in the protected activity of taking medical and family leave under FMLA.") Accordingly, Plaintiff has not shown Defendant discriminated or retaliated against him in violation of the FMLA.

### E.   Injured Workers Discrimination Claim

ORS 659A.040 prohibits discrimination against workers seeking workers' compensation benefits:

> It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS chapter 656 or has given testimony under the provisions of those laws.

Plaintiff must show three elements to support a claim for discrimination under ORS 659A.040: "(1) that the plaintiff invoked the workers' compensation system; (2) that the plaintiff was

discriminated against in the tenure, terms or conditions of employment; and (3) that the employer discriminated against the plaintiff in the tenure or terms of employment because he or she invoked the workers' compensation system." *Kirkwood v. W. Highway Oil Co.*, 204 Or. App. 287, 293, 129 P.3d 726 (2006) (citing *Hardie v. Legacy Health Sys.*, 167 Or. App. 425, 437, 6 P.3d 531 (2000)). This Court applies the *McDonnell Douglas* burden-shifting framework to employment discrimination claims arising under Oregon law. *See Anderson v. Hibu, Inc.*, 26 F.Supp.3d 1019, 1025 (D. Or. 2014).

Here, Defendant only challenges Plaintiff's injured worker claim on the grounds that he cannot show a causal nexus between Plaintiff's invocation of workers' compensation and any discrimination against Plaintiff in the tenure or terms of his employment. As with his OFLA and FMLA interference claims, Plaintiff argues that the "close proximity between invoking workers' compensation rights and the beginning of the adverse actions establishes a causal connection between the adverse actions and invoking the protecting of workers' compensation statutes." Pl. Resp. 19–20.

To survive summary judgment on the third element of Plaintiff's *prima facie* case for injured workers discrimination, Plaintiff must show that a reasonable factfinder could find that "plaintiff's invocation of the workers' compensation system was a *substantial factor* in defendant's adverse employment actions." *Anderson*, 26 F.Supp.3d at 1026 (internal citations omitted). In other words, it was "a factor that made a difference." *Id.* (citing *Estes v. Lewis & Clark Coll.*, 152 Or. App. 372, 381, 954 P.2d 792 (1998)).

There is conflicting case law in this district on whether a plaintiff can establish this element of his *prima facie* claim for injured workers' discrimination through temporal proximity alone. *Compare Kelly v. Ironwood Commc'ns Inc.*, No. CV 08-3058-CL, 2009 WL 3497811, at

*4 (D. Or. Oct. 29, 2009) (citing *Ledesma v. Freightliner Corp.*, 97 Or.App. 379, 383, 776 P.2d 43 (1989) ("Mere temporal proximity between the filing [of] a workers' compensation claim and termination is insufficient without more to satisfy the causation element.") *with Looney v. Wash. Cnty., Or.,* Civil No. 09–1139–HA, 2011 WL 2712982 at *6 (D.Or. July 13, 2011) (concluding that plaintiff met the causation requirement by "referenc[ing] the proximity between plaintiff's application for workers' compensation benefits . . . and his termination"). Cases finding temporal proximity alone insufficient to establish causation rely on *Ledesma v. Freightliner Corp.*, which held with little discussion:

> The facts show that plaintiff worked for defendant and that he was fired after he had applied for workers' compensation benefits. Apparently, according to plaintiff, all he need show to recover under ORS 659.410 is that he filed a workers' compensation claim and that he was discharged sometime thereafter. That is not the law.

97 Or. App. at 382–83. At least one other case in this district has addressed this issue. In *Alvarez v. Ecolab Inc.*, the Court declined "to preclude reliance on temporal proximity *alone* as a matter of law." No. 6:13-CV-01718-MC, 2014 WL 6684910, at *7 (D. Or. Nov. 25, 2014). The court found that *Ledesma* could be limited to its factual circumstances: a five-month time lapse between the plaintiff's workers' compensation filing and termination is insufficient as a matter of law to allow causation to be inferred from timing alone. *Id.* at *7. The court emphasized that this interpretation is consistent with federal retaliation case law and more recent case law in Oregon considering temporal proximity among other factors.

This Court agrees, especially where—as here—the adverse actions came on the heels of the protected activity. Plaintiff filed his claim for workers' compensation on September 12, 2016. Stuart Decl. Ex. 23. It was denied on September 21, 2016. Stuart Decl. Ex. 50. Plaintiff was placed on administrative leave two weeks after he filed his claim. Stuart Decl. Ex. 26. He was

placed on a medical layoff on October 14, 2016, and ultimately terminated on in June of 2017. Stuart Decl. Exs. 25, 27; *see Looney*, 2011 WL 2712982, at \*6 (finding that the plaintiff established a *prima facie* case of discrimination because of "the proximity between plaintiff's application for workers' compensation benefits, November 26, 2008, and his termination, February 27, 2009."). Further, as noted above, despite having been cleared to return to work after an independent examination in November of 2016, it appears that Plaintiff was not returned to work and remained on administrative leave throughout that time. *See* Stuart Decl. Ex. 34 (indicating that Plaintiff would have to undergo a third IME prior to resuming regular duties). On these facts, the Court concludes that a reasonable factfinder could conclude that Plaintiff's workers' compensation claim was a substantial factor in the subsequent adverse actions. Because Defendant made no argument on the second and third steps of the *McDonnell Douglas* burden-shifting framework, the Court ends its analysis here.

## II.     Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment on his claim for disability discrimination under the ADA. Pl. Mot. Summ. J. ("Pl. Mot."), ECF 47. The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability[.]" 42 U.S.C. § 12112(a). Likewise, ORS 659A.112(a) makes it unlawful for an employer to "discriminate in compensation or in terms, conditions, or privileges of employment on the basis of disability." The state statute is to be construed "to the extent possible in a manner that is consistent with any similar provisions of the Americans with Disabilities Act." ORS 659A.139; *see also Atwood v. PCC Structurals, Inc.,* No. 3:14-CV-00021-HZ, 2015 WL 3606323, at \*9 (D. Or. June 4, 2015) ("The standard for establishing a *prima facie* case of discrimination under Oregon law is identical to that used in federal law.").

To establish a *prima facie* case of disability discrimination under state or federal law, a plaintiff must show: "(1) that she is disabled within the meaning of the ADA; (2) that she is a qualified individual with a disability; and (3) that she was discriminated against because of her disability." *Smith v. Clark Cty. Sch. Dist.,* 727 F.3d 950, 955 (9th Cir.2013) (citing *Nunes v. Wal-Mart Stores, Inc.,* 164 F.3d 1243, 1246 (9th Cir.1999)). "A qualified individual with a disability is defined as an 'individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Id.* (quoting 42 U.S.C. § 12111(8)); *see also* ORS 659A.115 ("[A]n individual is qualified for a position if the individual, with or without reasonable accommodation, can perform the essential functions of the position."). "If Plaintiff establishes a *prima facie* case of disability, the court applies the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green.*" *James v. Oregon Sandblasting & Coating, Inc*., No. 3:15-CV-01706-HZ, 2016 WL 7107227, at *10 (D. Or. Dec. 4, 2016). Both parties agree that Plaintiff can demonstrate the first and third elements of his *prima facie* case. They dispute whether Plaintiff can succeed on the second.

The court engages in a two-step analysis to determine whether an individual is qualified. First, the court "examines whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the position." *Bates v. United Parcel Svc., Inc.*, 511 F.3d 974, 880 (9th Cir. 2007). Second, the court "considers whether the individual can perform the essential functions of such position with or without a reasonable accommodation." *Id.*

The parties agree that Plaintiff has the requisite skill, experience, education, and other job-related requirements. At least for the purposes of this motion, the parties also appear to agree on what the essential duties of a jail deputy are. *See* Leinenbach Decl. ¶ 55, Ex. 19. However,

they disagree on whether Plaintiff can perform those essential functions.

The Court finds that there is a dispute of material fact as to whether Plaintiff can perform the essential functions of his position as a jail deputy with or without a reasonable accommodation. On one hand, Plaintiff asserts in his declaration that, having reviewed the job description provided to Dr. Klecan, he is capable of performing the essential duties of the job. Leinenbach Decl.¶ 55. Dr. Turco similarly found that Plaintiff was fit for duty. Stuart Decl. Ex. 49. On the other hand, Defendant provides reports from two medical examiners who found that Plaintiff cannot perform the essential duties of his position with or without reasonable accommodation. Dr. Corey found that Plaintiff could not perform many of the essential functions of the position—including working under emergency and stressful conditions and supervising inmates. Stuart Decl. Ex. 44 at 4. He also found that his impaired functioning could have catastrophic consequences for the welfare of others in his "safety-sensitive position." *Id*. Dr. Klecan found that Plaintiff could not conduct himself appropriately with his co-workers and was incapable of being supervised. Stuart Decl. Ex. 48. From these reports, a reasonable factfinder could infer that Plaintiff was unable to perform the essential functions of his job as jail deputy with or without accommodation. *See Mayo v. PCC Structurals, Inc.*, 795 F.3d 941, 944 (9th Cir. 2015) ("An essential function of almost every job is the ability to appropriately handle stress and interact with others."); *see also Vande Zande v. State of Wis. Dep't of Admin*., 44 F.3d 538, 544 (7th Cir. 1995) (finding, in a discussion of reasonable accommodation, that "most jobs in organizations public or private involve team work under supervision rather than solitary unsupervised work"). Because there is a dispute of fact with respect to the second element of Plaintiff's *prima facie* claim for disability discrimination under the ADA and ORA, Plaintiff's motion for partial summary judgment is denied.

**CONCLUSION**

Plaintiff's Motion for Partial Summary Judgment [47] is DENIED. Defendant's Motion for Partial Summary Judgment [50] is GRANTED in part and DENIED in part. Plaintiff's claims for retaliation and discrimination under the FMLA and OFLA and a hostile work environment under the ADA are dismissed with prejudice.

IT IS SO ORDERED.

Dated this _____ 11 _____ day of _____ Dec _____, 2018.


_____
MARCO A. HERNÁNDEZ
United States District Judge